

# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MARCO OUTDOOR** | * | |
| **ADVERTISING, INC.,** | * | |
| **PLAINTIFF** | * | **CIVIL ACTION NO. 05-1941** |
| | * | |
| **versus** | * | |
| | * | **SECTION "C' / MAG. 2** |
| **THE REGIONAL TRANSIT** | * | |
| **AUTHORITY,** | * | |
| **DEFENDANT** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## *TRIAL MEMORANDUM*

*NOW INTO COURT*, through undersigned counsel, comes Plaintiff, Marco Outdoor Advertising, Inc. ("Marco"), who, with respect, submits this Trial Memorandum.

## *INTRODUCTION*

These proceedings were instituted by the highest bidder on a public contract, Marco, to force a governmental agency to adhere to the requirements of the Louisiana Public Bid Law, LA-R.S. 38:2211, et seq. After repeatedly seeking the results of a public bid process, Marco finally learned that its bid of $13,550,000 far exceeded the $9,846,000 bid of the Intervenor, Clear Channel Outdoor, Inc. ("Clear Channel"). During the course of its investigation of this process, via various public records requests, Marco learned that the Regional Transit Authority ("RTA"), a public agency, through its Chairman and Private Contractor, Transit Management of Southeast Louisiana ("TMSEL"), had gone to great pains to subvert the public bid process in an effort to award a lucrative multi-million dollar display advertising contract to its designated contractor and to prevent Marco from attaining this contract.

___ Fee _____
___ Process _____
_X_ Dktd _____
___ CtRmDep _____
___ Doc. No. _____

RTA and Clear Channel cannot point to any other bid or procurement process as controlling herein. Their position is that RTA was legally able to award this public contract to whomever it chose for whatever reason it chose. The RTA, in correspondence to Marco dated January 4, 2005, stated, "Further, the RTA will accept or reject any and all proposals for various or **imperious** reasons." (*Emphasis Added*) Clear Channel and RTA ask this Court to sanction an "imperious" selection process as opposed to adherence to the Louisiana Public Bid Laws.

## *I. FACTS WHICH WILL BE PROVEN AT TRIAL*

**Marco:**

The Plaintiff in these proceedings is a Louisiana Corporation with its offices located in New Orleans, Louisiana. Marco was founded in 1987 by its sole shareholder, Marc E. Winston ("Winston"). Marco is in the business of operating billboards in the New Orleans Metropolitan area, where it is the second largest billboard contractor.[1] Marco is profitable and successful. It is a company valued in excess of twenty-five ($25,000,000) million dollars with virtually no debt. It has consistently grown since its formation.

Marc Winston literally grew up in the transit advertising business. Originally from New York, Winston moved to New Orleans in 1958. His father had been awarded the transit advertising contract to sell the advertising space on the buses and streetcars of New Orleans, then operated by New Orleans Public Service, the predecessor to the RTA. Winston's high school, college, and post-graduate years were spent in the transit advertising business in New Orleans selling space and "carding" the buses. He later became the Chief Executive Officer of the family business, The Winston Network / Transportation Display Incorporation ("TDI"), who was headquartered in New York, New York. At the time the business was eventually sold, Winston headed the largest transit

---

[1] Intervenor owns no billboards in this area and is, therefore, categorically unable to comply with a mandatory requirement in the bid documents which call for the successful bidder to provide billboards to the RTA.

advertising operation in the world.  Winston's former company sold the space on New Orleans buses and streetcars from 1958 to 2002, when TDI sold the local business to Intervenor, Clear Channel.  Clear Channel, which only operates transit advertising in three (3) cities, has leased the RTA space since sometime in 2002.  The local manager for Clear Channel, Tim Fenasci, was hired by Winston in 1985 and has been retained by the new operator, Clear Channel.  Fenasci came to Winston without any experience in advertising sales or transit.  Marco's average sales in the New Orleans area exceed $3,000,000 per year versus those of Clear Channel of around $1.5 million.

### 1998 Bids:

In 1998, the RTA placed the sales of its transit advertising space out to bid, or for proposals, as it prefers to reference its procurement process.[2]  Marco submitted a bid at that time, but was only the third highest bidder for the five (5) year contract at issue.  In 1998 and 1999, Marco expressed its position to the RTA that it was obligated to follow the Public Bid Law of the State of Louisiana but had no standing, nor need, to challenge that award since its monetary bid was not the highest.

One of the highest bids at that time was submitted by Winston's former company, TDI. There was an unusual twist to the procurement process, apparently necessitated by the RTA's miscalculation of the funds available for its operations.  RTA became desperate in the middle of the procurement process for a cash infusion and asked TDI to prepay its guaranteed bid amount in a lump sum.  It did so, and was therefore awarded the contract.  Strangely, this process was never

---

[2] See *Worldwide Parking, Inc. vs. New Orleans,* 123 Fed. Appx 606 (5th Cir. 2005) where the Fifth Circuit has recognized that calling a procurement process, which is  governed by the Louisiana Public Bid Law, a Request for Proposal does nothing to relieve the public agency of its requirement to follow the mandates of the Public Bid Law to award the contract by competitive bids to the monetarily successful bidder be it high, as in the case of revenue generating contracts, or low, as in the case in contracts where the agency is spending funds.   See *HTW Transportation Co., Inc. v. The New Orleans Aviation Board,* 527 So.2d 339 (La. App. 4th Cir. 1988).

mentioned in the original bid documents.  RTA had given Marco a glimpse of its future behavior, in which it would change the bid requirements after the bids had been submitted.[3]

The bid documents used in the 1998 procurement were virtually identical to the ones used in the 2004 bid process.  However, the **1998** documents contained more stringent requirements of the bidders.[4]  The 1998 and 2004 documents were also identical concerning the description of the non-monetary requirements required of the successful contractor.  Both documents contained DBE "Goals."  The comparison is as follows:

|  | *1998 Proposal* | *2004 Proposal* |
|---|---|---|
| Contract period: | 5 years | 10 years with RTA, only, having an option to renew for additional 5 years |
| Experience Requirement: | must have operated in Metropolitan statistical Area similar to New Orleans with 400 vehicles | None |
| Financial Responsibility: | A)  irrevocable letter of Credit equal to one year's Minimum guarantee | None |

---

[3] Despite the professed "new leadership" of the RTA, which has been in place for over two years, the agency must again be in financial difficulty since it is proposing to change the rules of the proposal to either allow or require a prepayment of the guaranteed amount of payment to the RTA.  The following is quoted from an email of the "Director" of Procurement, Gene Wulfekuhler to the Clear Channel local manager, Tim Fenasci, of May 19, 2005, (six days prior to the filing of Marco's Complaint), which states, "Tim:  We had a meeting with the Chairman (James Reiss) and he is interested in what would be Clear Channel's offer to pay the **five years up front**.  Can you send the information to Mark Major and me by email?  It would really be helpful if you can get it to us before next Thursday.  Thanks, Gene."  (Parenthetical information and emphasis added)  Clear Channel was more than willing to turn its five year bid of $4,500,000 into $3,089,000 by correspondence of the President of Clear Channel, Taxi Media, of May 24, 2005.  What is truly disheartening about Chairman Reiss' proposal to allow Clear Channel to "pre-pay," at a discount, its guarantee, is the misrepresentation of Gene Wulfekuhler made during the procurement process.  On September 24, 2004, Winston, in written correspondence, categorically asked Wulfekuhler, "Is the authority going to permit upfront payments of the entire five year amounts as happened last time?"  Wulfekuhler responded, "No."
[4] TDI, who sold the business to Clear Channel is an industry leader in transit advertising and could meet the previous demands.  Clear Channel, which only operates three smaller transit operations, could not.

|  | B) accredited financial statements for last 5 years | Provide agency with information to show it has resources to perform the contract. Be able to show it can remain in business during contract |
| --- | --- | --- |
| DBE: | 30% Goal | "DBE goals have not been Established for this project." |
| Non-Marketing Benefits Contractor Media (Billboards and Bus Shelters) | Contractor **shall** provide $50,000 worth of Contractor media annually | Identical |
| Bartered print or Broadcast media | Contractor shall provide $25,000 worth of Bartered print or Broadcast media annually | Identical |
| Marketing Analysis Services | Contractor shall provide $75,000 worth of various items annually | Identical |

**1999 Contract:**

TDI executed a contract with the RTA in March of 1999 for a five (5) year period.[5] Although this contract required payments of the overage above the minimum guaranteed annual payment received by Clear Channel, no effort of any type has been made by the RTA to determine whether this overage is due. The RTA also has never determined whether the contractor fulfilled its DBE goals, nor has it collected any amount of non-monetary benefits due under the contract. Under the 1999 agreement, the contractor was required to provide $750,000 worth of billboard print and media space and market analysis; however, the RTA has yet to collect a penny of this amount! At

---

[5] The contract in place prior to the 1999 contract expired sometime in 1998, however, the 1999 contract began in October of 1999, and expired in October of 2004. Therefore, Clear Channel continues to operate and enjoy the fruits of this contract sixteen (16) months after its expiration.

his deposition, Pat Judge, the Director of "Marketing" of the RTA, seemed amazed that this provision was in the contract, especially since the RTA had spent its own funds to purchase advertising space from third parties when its could have been receiving this without charge from Clear Channel.  During the discovery depositions of eight (8) employees of the RTA and James Reiss, the Chairman, no one seemed to know who was responsible for contract compliance. Wulfekuhler said Judge, and Judge said Wulfekuhler.[6]

Marco will show at trial that the RTA received nothing of value from the "contractor" other than a pre-payment check in 1999, and a few bus ads on vacant space, provided the RTA paid for the expense of printing, etc.  Marco submits that it is disingenuous at best, and ludicrous at worst, for the RTA and Clear Channel to argue that the difference in Marco's bid and Clear Channel's bid should be determined by adding Clear Channel's suggested proposal to furnish the RTA with, not only the required $150,000 worth of non-monetary benefits that have gone unused for seventy-six (76) months, but an additional $170,000 worth of the same unused benefits.

The 1998 Request for Proposal, in Section 3.11, called for, ". . . ridership marketing analysis . . . access to the Contractor's computer terminals, data bases, surveys, demographic studies and demonstration projects."  None of these "benefits" have ever been utilized by the RTA.  However, that has not stopped the RTA from arguing to this Court that the next ten (10) years will be different.  This time they will use these benefits.  Also, **these** benefits, the RTA argues, constitute the reason this contract is for "professional services."  Marco will show that, not only are these benefits not professional, they were never utilized and will not be in the future.

---

[6] The RTA alleges it has only one employee, its secretary, and all of its operations are conducted by an entity known as Transit Management of Southeast Louisiana ("TSMEL").

**2004 Bid Process:**

At the August meeting of the RTA Board, it authorized solicitation for bids (proposals), not only for the transit display advertising, but also for bench and transit shelter contracts.[7]  It appears from an early, April 12, 2004, email of RTA employee, Pat Judge, that he was chosen to get the "ball rolling" on this solicitation.  Judge, ostensibly, should be the person most familiar with the terms and compliance of the previous contract.  One assumes that the RTA would check with the manager who was in charge of the previous contract (Judge) prior to drafting the solicitation document for the new one.  However, Judge did not participate in drafting the agreement.  This was left up to Gene Wulfekuhler, the "Director" of Procurement, who had no responsibility for "marketing" the RTA.  Wulfekuhler made the decision to include the non-monetary requirements in the contract proposal without the knowledge that the RTA had never used these benefits.  He drafted a document that included these benefits as mandatory requirements without first checking to see if they had ever been used.  He later graded the bids and gave additional credit to Clear Channel in the amount of $3,200,000 for contract compliance and a willingness to supply an additional $1.7 million of useless, never used, non-monetary benefits.

In disregard of Marco's previous requests for notice of the bid process, it was not informed of the solicitation, nor was it notified of the pre-bid conference held by the RTA on August 25, 2004.  On September 24, 2004, Marco informed RTA of this oversight, asked nine questions, and requested a transcript of the pre-bid conference.  The alleged DBE "requirements," which were not included in the Request for Proposal were never provided by addendum.[8]

---

[7] Again, the records of the RTA shed no clue concerning why this agency would want to lump these three contracts together, unless it allowed it to further subjectively skew the award to its favored contractor.  It is suggested that lumping these three contracts together set up an unsolvable legal riddle under the Public Bid Law.  Had any bidder chosen to bid on more than one aspect of these contracts were the bids going to be considered together or analyzed individually?

[8] Addendum No. 1 extended the bid date to November 1, 2004.  Addendum No. 2 extended the bid date to December 1, 2004.  Addendum No. 3 extended the bid date to January 18, 2005.  There were no other addenda.

Although it remained concerned about the bid process, Marco timely submitted its bid on January 18, 2005. In clear, unqualified language, Marco bid a guaranteed payment to the RTA of $13,550,000 and sixty (60%) percent of revenue. The next highest bid was that of Titan Outdoor, and the **third** highest bidder was Intervenor, Clear Channel, who bid $9,846,000 and fifty-five (55%) percent of revenue.

Marco was never told of the contents of the bids until the "evaluation" process was completed, and the staff of TMSEL had recommended to the RTA Board that Clear Channel be awarded the contract. (Marco had requested the contents of all bids in writing on January 19, 2005, the day after the bids were submitted.) RTA insisted on keeping the bids and the process secret. In fact, Marco did not learn of the bid contents until its counsel made a public records request to the RTA dated April 21, 2005. RTA responded that the information would be first made available on the **afternoon** of April 28, 2004. The Board meeting to approve the contract between Clear Channel and the RTA was scheduled for the **morning** of the 28th of April!

### 2004 Evaluations:

As stated previously, the bids were received on January 18, 2005, and "evaluated" between that date and the date that the award to Clear Channel was recommend to the RTA Board on April 28, 2005. The evaluation process was a complete sham. It was a concerted effort to deny the highest bidder the contract and to award it to the pre-bid favorite, Clear Channel. The evaluation team had three components. The first component was the "financial issues" committee, composed of Gene Wulfekuhler, the RTA's general counsel, Darrell Brown, and its Deputy Director, Mark Major. Secondly, the actual "merits" of the proposals were evaluated, not by the user or marketing department, but by another lawyer, Marsha Hopper, and the public relations specialist for the RTA. Neither of these individuals had undertaken any compliance role on behalf of the RTA in its

8

previous contract with Clear Channel. While neither individual had anything to do with the 1999 contract, they were asked nonetheless to subjectively evaluate these multi-million dollar proposals without any background, training, or instructions. The evaluations were purely subjective since they were not judged according to a defined standard nor in accordance with the bid documents.

The third component of the evaluation team was Janice Abadie, the DBE compliance person for the RTA. She was the person responsible for the passing or failing grades given to the bidders. Despite glaring non-compliance with the DBE "requirements," and her later written comments that Clear Channel really needed to comply with the DBE requirements, she gave Clear channel a passing grade. During the grading, she stated that, even if Clear Channel had failed to comply with the DBE requirements in its proposal, it could later make it up at the contract signing.

The Director of Procurement prepared a spreadsheet on January 24, 2005, that was apparently distributed to the TMSEL management and the rest of the evaluation teams. This spreadsheet accurately listed Marco's bid for the ten year period at $13,550,000 and sixty (60%) percent. He initially listed Clear Channel's bid at $9,846,000 and fifty-five (55%) percent, however, he added to this sum uncalled for non-monetary benefits in the annual amounts of $150,000 and $170,000 to bring Clear Channel's bid to $13,046,000, still over one-half million dollars less than Marco's. This single act completely invalidates the process used by the TMSEL staff to objectively compare the bids.

### Non-Monetary Benefits:

As shown earlier, the 1999 and 2004 Requests for Proposal contained the following identical language:

### 3.4 NON-MONETARY BENEFITS

A.      For each contract year, Contractor **shall provide** RTA a total of fifty thousand and 00/100 dollars ($50,000.00) of Contractor media

(**billboards** and bus shelters) for RTA's promotion based on Contractor's current rates.

B.  For each contract year, Contractor **shall provide** RTA a total of twenty-five thousand and 00/100 dollars ($25,000.00) of bartered print or broadcast media for RTA's promotions.

C.  The dollars referred to in 3.4 A and 3.4 B herein are non-cumulative.

D.  Contractor will not be responsible for production cost or agency fees associated with RTA's promotions.

\*       \*       \*       \*

## 3.11   MARKETING ANALYSIS SERVICES

Contractor  shall provide  seventy-five thousand and 00/100 dollars ($75,000.00) annually, with no carryover, ridership marketing analysis including a market analyst, access to the Contractor's computer terminals, data bases, surveys, demographic studies and demonstration projects. Under the Marketing Analysis Services, RTA has the option to purchase additional marketing services.

The language in both of these sections is clear and unambiguous. As part of the contract, the contractor **must** provide a total of $150,000 annually of billboard space, bartered print and media, and marketing analytical studies. However, the RTA had **never** previously used any of these required "benefits." This did not stop Gene Wulfekuhler from unilaterally determining that he would not only add the amount of the required benefits to the total of Clear Channel, but that he would also add the extra amount Clear Channel said it would offer to the RTA. So, Wulfekuhler awarded an extra $1,500,000 (10 years worth) to the bid of Clear Channel for the required benefits and also added their bonus amount of $1.7 million. By the stroke of Wulfekuhler's pen, Clear Channel's bid of $9,846,000 was increased to $13,046,000. This was accomplished even though no other contractor said they would not comply with this requirement, nor was there any mention in the bid documents that the RTA would add to the financial offer any excess amounts committed by the bidder.[9]

---

[9] As stated earlier, Clear Channel could have included any figure it chose since it knew the RTA had never used these benefits previously.

without any ___

On March 18, 2005, Gene Wulfekuhler compiled the three components of the evaluation committees. Not surprisingly, Clear Channel emerged as the winner. However, if the bogus DBE bonus and non-monetary benefits are removed from the equation, then the Marco bid clearly exceeds that of Clear Channel and of any other bidder.

At no time during the entire evaluation process from January 19, 2005, until the award recommendation to the RTA Board on April 28, 2005, did the RTA ever inform Marco of <u>any</u> problems with its bid, nor did it request any clarification. However, Wulfekuhler asked several other bidders to clarify and explain their bids and categorically rejected, as not responsible, the bid of Laurel Communications. On the contrary, Wulfekuhler, in a March 18, 2005, email prior to the instant lawsuit, stated:

> "There was competition developed for this contract. Therefore, the amounts proposed and the percentages are fair and reasonable based upon the fact that six (6) firms competed independently for this contract."

Marco was one of the six (6) firms. This statement was made in the same email, March 18, 2005, where he compared Marco's bid as one for $13,550,000 and sixty (60%) percent with Clear Channel's as one for $13,046,000 and fifty-five (55%) percent. Wulfekuhler forgot to mention that Clear Channel's bid was based on the required non-monetary benefits and excess benefits it promised although never asked for by the RTA.

Having been substantially outbid by Marco, Clear Channel was nevertheless invited to make a "Last and Final offer." This resulted in the guarantee being raised slightly to $10,186,000 with a fifty-five (55%) percent revenue sharing amount. Marco's bid was still $3,364,000 better than Clear Channel's.[10]   During this time, Chairman Reiss of the RTA began to get involved in the

---

[10] On April 6, 2005, Janice Abadie continued to request DBE compliance documents even though she had previously awarded Clear Channel a ten (10) point bonus. Clear Channel finally submitted some names of DBE firms on April 19, 2005, but never committed to their hiring.

procurement process when he suggested award of the shelter portion of the proposal to a former member of the RTA Board, Dana Pecoraro.

At the **April** 28, 2005, meeting of the RTA Board, it received the recommendation of the "Director" of Procurement to award the contract to Clear Channel, but asked to defer the award one month to determine Clear Channel's policy concerning certain ads. Subsequently, Reiss emailed Marco that it had been decided to award this contract to Clear Channel at the **May** 26, 2005 Board meeting. In the days immediately preceding the May meeting, Reiss was negotiating for lump sum payments from Clear Channel when Marco had previously been told that would not happen.

### No Professional Services:

As indicated previously, this contract is simply one for the lease of RTA space for the contractor to re-lease for advertising purposes. It does not involve any services, much less professional services. Since this 2004 proposal is virtually identical to the previous 1998 proposal, one needs only to examine whether any services, or professional services, were rendered in the previous contract. None were. The Defendant and Intervenor have listed several "services" they say are evidence of the professional nature of the 2004 proposal. These were also included in the 1998 proposal but were never used by the RTA. They now point to these unused services as the basis for their argument that the 2004 proposal was for professional services. It was not.

After meeting with the Chairman of the RTA on May 10, 2005, in an effort to dissuade it to award the contract to Clear Channel, Marco was informed that the contract was to be awarded at the May 26, 2005, meeting by email of Reiss on May 24, 2005. This lawsuit was filed on May 25, 2005.

## *LAW AND ARGUMENT*

### Introduction:

Marco submits that the proper approach to the legal issues herein involves an analysis of the contract at issue, in light of the RTA's previous experience with virtually the same contract and a determination of whether that contract uniquely falls within the purview of the Louisiana Public Bid Law as statutorily made applicable to the RTA.

### Procedural History:

On two separate occasions, this Court has held that the contract at issue is one that is subject to the competitive bid provisions of the Louisiana Public Bid Law. On June 14, 2005, the Court said, "Accordingly, the Court finds that the Louisiana Public Bid Law is applicable to the RTA contract."[11] Thereafter, on July 7, 2005, the Court again restated its position when it stated, "The RTA now argues that *Nolan* is distinguishable because it involved a public work, whereas the instant matter involves professional services. The Court is not persuaded that this difference is significant. For the reasons stated in the June 14, 2005, Order, the Court finds that the Louisiana Public Bid Law is applicable to the RTA contract."[12]

While there remains a trial to determine factual issues not yet presented, it is clear that the Court has made a legal determination that the provisions of LSA-R.S. 48:1660 statutorily require the RTA to award contracts competitively by forcing it to use the Public Bid Law. That leaves the trial to determine if there are factual reasons why the Public Bid Law should not be applied under the professional services exclusion argued by the RTA.

---

[11] This ruling came as a dismissal of the RTA's 12(b)(6) Motion to Dismiss. Here, the Court examined the nature of the contract attached to the Complaint, the Public Bid Law, LSA-R.S. 38:2211 et seq., and the unique legislation whereby all contracts of the RTA are required to be awarded by "competitive bidding." LSA-R.S. 48:1660. It also recognized that this District had previously held that the RTA was, in fact, subject to the Public Bid Laws. *Nolan Contracting, Inc. v. Regional Transit Authority*, 651 F.Supp. 23 (E.A. La. 1986)

[12] Rec. Doc. 51, Page 2, Order denying the Motion to Reconsider the Original Dismissal of 12(b)(6) Motion to Dismiss.

## ANALYSIS

The RTA was created as a ". . . body politic and corporate and a political subdivision of the State of Louisiana. . ." (Act 1979, No. 439C, LSA-R.S. 48:1654)  It was given broad powers, including the power to contract.  However, the Louisiana Legislature required that all contracts where the RTA was a party must be awarded by competitive bidding as indicated by the title line of the following statute:

**§ 1660.  Competitive bidding on contracts, etc.**

By way of illustration and not specification, all purchases, acquisitions, dispositions, contracts, leases, bond sales, and like actions of the authority referred to in the provisions of this Chapter shall be subject to the public bid laws of this state.

The RTA and Clear Channel will be faced with the inescapable conclusion that the Public Bid Law must be applied to the contract at issue.  At that point, Plaintiff anticipates that they will then attack the bid of Marco by arguing that the bid of Marco was not for $13,550,000, or that Marco did not comply with some other provision of the bid documents.  These attacks are nothing more than post-bid rationalizations which are prohibited in Louisiana.  *HTW Transportation Company, Inc. v. The New Orleans Aviation Board*, 527 So.2d 339 (La. App. 4th Cir. 1988); and *Haughton Elevator Division v. State of Louisiana*, 367 So.2d 1161 (La. 1979).

However, it will be clear from the testimony and evidence adduced at trial that any alleged defects in Marco's bid were not taken into account by the RTA in its evaluation of the bids.  Marco will show that the financial "grades," including Gene Wulfekuhler, all recognized that Marco's bid was for the full amount of $13,550,000 not for the $6,000,000 figure mentioned by Clear Channel.  All of the documentary evidence produced through discovery supports this through May 13, 2005, when Wulfekuhler notified another bidder that Marco's bid was for the full $13,550,000 and for sixty (60%) percent of revenue.

Further, Marco was never notified that anything in its bid required explanation or was ambiguous, even though the testimony will show that the RTA made similar requests of other bidders on at least two other occasions. Had the RTA perceived that there were any defects or problems with Marco's bid, they were able to notify Marco and afford it the opportunity to defend itself as required by the Louisiana Supreme Court in *Haughton Elevator Division v. State of Louisiana,* 367 So.2d 1161 (La. 1979). They did nothing of the sort and may not now do so.

### The Contract at Issue is Not for Professional Services:

The RTA and the Intervenor will continue to argue that this contract is either one for services or one for professional services and, therefore, is excluded from the Public Bid Laws even though the foregoing statute makes no such exception. First, it is not for a service, but rather for the use of space. There are **no** services provided. The successful bidder could theoretically have one advertiser, or two or three, who could take all of the available space for advertising its products. RTA's revenue requirements of the contract would be completely satisfied, but there would be no service provided to the RTA. Paying rent is not providing a service, it is rent. Generally, those who provide services are paid, not the opposite.

The testimony at trial will show there was a prepayment by TDI, Clear Channel's predecessor, in 1999. Thereafter, there was virtually no interaction between the parties. No direction of TDI / Clear Channel. No "services" were performed. Space was leased and resold, presumably for a profit. Therefore, this contract is not for any "service," much less "professional service."

The RTA substantially bases its defense on the grounds that the solicitation for bids involving the display advertising space on the RTA's vehicles, is a contract for **professional** services, and, therefore, it is excluded from the provisions of state public bid law. First, as shown

above, this is not a service contract of any type, much less one for professional service. It is a contract for the use of space, more akin to a lease, than to a service. However, it is surely not a contract for any "**professional**" services.

### The Public Bid Applies.

Section 1660 does not merely reiterate that the public bid law is in existence, which would have served no legislative purpose to merely restate the law. This section specifically added certain types of procured items and contracts to the list of items governed by the public bid law.

See also *New Orleans Rosenbush Claims Services, Inc. v. City of New Orleans*, 653 So.2d 538, 544 (La. 1995), which states:

> When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written without further interpretation in search of the intent of the legislature. . . . The legislature is presumed to have enacted a statute in light of the preceding statutes involving the same subject matter and court decisions construing those statutes, and where the new statute is worded differently from the preceding statute, the legislature is presumed to have intended to change the law. . . (citations omitted)

Here, the legislature clearly intended to require that the RTA use competitive bidding as provided by the public bid laws. It denied the RTA the ability to unilaterally award display advertising contracts to whomsoever it chooses.

The argument of the RTA that this contract is not subject to the public bid laws of Louisiana further begs the question raised by Plaintiff's Complaint. What procedure must the RTA follow in the award of this contract? May it "disqualify" bidders without ever notifying them? May it award "extra" points to a bidder merely for complying with the bid specifications when denying the same points to every other bidder who does likewise? Can it use award criteria that are a secret to the bidders? May it award bonus points to a bidder who fails to

submit a DBE plan at the time of the bid, but is allowed to supplement the bids after they are opened?  Can this bidder be given DBE bonus points when every other bidder was told there were no DBE requirements?  May a public agency be arbitrary and capricious in awarding a public contract?  Can one bidder be allowed to secretly raise its bid?  Is the foregoing a denial of the due process rights of a bidder?  Can the RTA be imperious in its award procedures?

The public bid law, LA R.S. 38:2211 *et seq.*, requires objective determination of the highest (or lowest) amount due to the public agency.  It does not allow the public agency to arbitrarily award contracts based on unpublished criteria nor does it allow an agency to "negotiate" with one bidder after the bids have been submitted as was done by the RTA in this award process.

At all levels, Louisiana courts have consistently held that the mere declaration that a contract is for professional services is irrelevant if, in fact, the bid documents do not truly require professional services.  The courts have rejected the argument of public agencies that because the agency let out the contract pursuant to a Request for Proposal or called it a professional services contract, it does not have to comply with the public bid law.  To accept this argument would allow agencies to circumvent the requirements of the public bid law simply by characterizing it as a Request for Proposal or for professional services.  *Worldwide, supra; Rosenbush, supra.*

The leading case in Louisiana dealing with this issue is the 1977 case of *Transportation Displays, Inc. vs. City of New Orleans*, 346 So.2d 359 (La. App. 4th Cir. 1977)  In *Transportation Displays, Inc.*, the contract at issue involved display advertising at New Orleans Airport.  The Court recognized that display advertising did not involve any professional services, and therefore was not excluded from the requirements of the public bid law.  It held that airport terminal display advertising, while highly specialized, was obviously, ". . . **not** non-competitive."  It also recognized that the appropriate way to analyze the true nature of the contract was to examine, by way of

evidence and testimony, the operations being undertaken by the current contractor. At trial, this Court will have the opportunity to ascertain what has taken place pursuant to the existing contract and compare it with the proposed new contract to determine if **any** professional services are involved.[13]

The court went on to hold that the **advertising contracts** themselves were not between the agency and the advertiser, but between the contractor and the advertiser, and that display advertising sales are not unique to the venue where they are displayed. It said, "generally, the public body is allowed to exercise discretion in contracting for services which require use of creative and individual talents or unique artistic skills, or which require counseling and advice based on training and experience in fields of science or learning, or which otherwise require such extraordinary skill and learning that other factors far outweigh monetary considerations in determining the acceptability of the bidder." *Id.* However, it found that a contract for the sale of display advertising at a public airport is not a professional service.

In Footnote 5 of the *Transportation Displays, Inc.* case, *supra* at 1364, the court interpreted the word "professional" as follows:

> 5. "Professional" is not used here to describe the quality of the services or to distinguish the highly proficient from the mere amateurs, but rather denotes a persona in a profession which required years of education and service for one to attain competence and which calls for a high order of intelligence, skill and learning.

---

[13] In *Transportation Displays, Inc.*, the court characterized the nature of the contract as follows: "The invitation to bid stipulated that the contract with the successful proposer contain provisions granting the proposer "the exclusive right to conduct the sale of advertising space and facilities as set forth in the contract in the terminal building and adjacent facilities at the airport" and requiring the proposer "when necessary (to) design, plan, and supervise the construction of displays to occupy the advertising space, or assist the advertiser in such functions as required, and sell such advertising space and facilities in accordance with accepted advertising principals." Another required provision called for the initial allotment of advertising space and locations for advertising displays in accordance with a layout exhibit on which the space and locations were marked, but provided further for Board approval of any use of space not specifically allocated. Other pertinent provisions required the proposer to "supply necessary sales efforts and costs for the selling of any and all display", to "approve and be responsible for the quality of displays installed in the terminal", the Board reserving the right to approve and disapprove any advertising contract or display, and to "supply all facilities and displays to be used in the Terminal." The provisions of that contract are almost identical to the contract at issue herein.

*Transportation Displays, Inc.* was followed and cited approvingly in *Council of the City of New Orleans v. Morial,* 390 So.2d 1361 (La. App. 4th Cir. 1982). In that case, the contract at issue involved the administration of the City of New Orleans' healthcare services for its employees. The court found these services to be clerical in nature, and that they did not involve any particular vocational or professional training. Although it recognized that the contractor may at times have to employ professionals, it did not find that persuasive. For assistance, the court looked to the Louisiana State Procurement Code LA R.S. 39:1484 for its definition of Personal and Professional Services, as follows:

> (15) "Personal Service" ' means works rendered by individuals which require use of creative or artistic skills, such as but not limited to graphic artists, sculptors, musicians, photographers, and writers, or which require use of highly technical or unique individual skills or talents, such as, but not limited to, paramedicals, therapists, handwriting analysts, and expert witnesses for adjudications or other court proceedings.
> (17) "Professional Service" means work rendered by an independent contractor who has a professed knowledge of some department of learning or science used by its practical application to the affairs of others or in the practice of an art founded on it, including but not limited to lawyers, doctors, dentists, veterinarians, architects, engineers, landscape architects, and accountants. A professional is a vocation founded upon prolonged and specialized intellectual training which enables a particular service to be rendered. The word "professional" implies professed attainments in special knowledge as distinguished from mere skill.

Finally, the Louisiana Supreme Court addressed the issue of the interpretation of what types of contracts are "professional" contracts, and therefore excluded from the provisions of the state public bid laws in *Rosenbush, supra.* The *Rosenbush* case involved a contract to provide administrative services to the City of New Orleans for its self-insured workman's compensation program.[14] As is the case herein, the City of New Orleans resorted to a last ditch defense that it

---

[14]Although the state public bid law primarily deals with "pubic works" that statute must be read together with the provision of the City Charter, which requires the City to comply with all facets of the state public bid law in the award of its contracts, including those for "administrative services." This provision is similar to LSA-R.S. 48:1660, and the statute at issue in *Priority E.M.S., Inc. v. St. Bernard Parish Police Jury*, 1992 WL 59446 (E.D. La).

need not award a contract to the best quantitative bidder because it had absolute discretion in the award. It argued that the public bid law was not applicable since the contract at issue was for "professional" services.

The case is also noted for its discussion concerning the requirement that a bidder must be awarded the contract unless it had validly been disqualified prior to the award. See also *Pittman Construction Co. v. City of Baton Rouge,* 493 So.2d 178 (La. App. 1st Cir. 1986). Here, Marco was never disqualified or otherwise adjudged that it failed to comply with the specifications. Marco was never notified of any issues with its bid.[15] In *Rosenbush,* the Louisiana Supreme Court issued a mandamus awarding the bid to the Plaintiff and affirmatively and approvingly cited *Transportation Displays, Inc., supra,* and the *Council of the City of New Orleans vs. Morial, supra*, which had recognized a narrow definition of the exclusionary phrase "professional services."

The RTA cites several provisions of the solicitation as factors that should influence this Court to hold this display advertising contract to be "professional." None of these items are actually included in the body of the solicitation itself, nor do they have any relevance to the experience and nature of the operations of a display advertising sales entity. The RTA would have this Court believe that its display advertising sales agent is going to help it devise a "ridership market analysis." A display advertiser sales agent does not increase ridership, it sells ad space.

### *CONCLUSION*

Marco has a vested property right as the highest bidder to have its bid recognized as such and to be awarded this contract. It has successfully shown to this Court, in response to repeated challenges by the RTA and Clear Channel, that the Public Bid Law applies to the contract at issue.

---

[15] For that matter, Marco was never contacted by the RTA at any time subsequent to the bid. It only became aware of the proposed award by making a public records inquiry by its lawyer after its first inquiry was denied.

Marco has shown that it need not follow an inapplicable appeal process, and it has shown that revenue contracts are just as susceptible to the public bid law as are construction contracts.

Lastly, it has shown that the remedy of mandamus and injunctive relief are available and, therefore, asks this Court to declare it the successful bidder and award it the display advertising contract with the RTA.

RESPECTFULLY SUBMITTED:

KINNEY & ELLINGHAUSEN

BY: _____
    HENRY W. KINNEY (#7410)
    KRYSTENA L. HARPER (#27494)
    1250 Poydras Street, Suite 2450
    New Orleans, Louisiana 70113
    Telephone: (504) 524-0206
    Attorneys for Plaintiff, Marco Outdoor Advertising, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of August, 2005, a copy of the above and foregoing has been sent to all counsel of record in this action, by facsimile and via U. S. Mail, properly addressed and postage prepaid.